THE PEOPLE, Respondent, *v.* HARRIS SMILER, Appellant.

*Court of Appeals, Jan. 13, 1891.*

1. *Appeal. Evidence.*—The exclusion of the testimony of an impeaching witness upon a failure to identify the witness sought to be impeached, is not ground for reversal.
2. *Evidence. Expert.*—The hypothesis, submitted for an opinion, must be based upon the proofs and not go outside of the facts as to which some evidence has been given, and which can be assumed as the possible truth.
3. *Same.*—Instance of such question without basis of evidence.

Appeal from a judgment of the court of general sessions in and for the city and county of New York, entered upon a verdict convicting the defendant of the crime of murder in the first degree.

*John R. Heinzelman,* for appellant.

*John W. Goff,* for respondent.

FINCH, J.—Nothing in the facts developed on the trial of the prisoner throws a doubt upon the correctness of the verdict. The testimony fully establishes a deliberate and intentional homicide; and, whatever may have been the personal character of the principal witnesses for the prosecution, their account of the transaction is strongly corroborated, both by admitted and established facts and by the evidence of the prisoner himself. No one can read his attempted denial of the killing, and the test to which it was subjected upon cross-examination, without a thorough conviction that the four shots which killed his wife were fired by him.

It is claimed, however, that he was deprived unjustly of a full opportunity to impeach Mrs. Wilson, who was the principal witness for the people, by the ruling of the court which excluded the testimony of the witness Maunders.

That ruling rested upon the failure of the defendant to iden-
tify the Mrs. Wilson who testified and whose evidence was
assailed with the Mrs. Wilson whom Maunders knew and
about whose reputation he was prepared to speak. He was
not present when she was examined, and the only approach
to an identification was in describing her as "living at No.
284 Seventh avenue." But a description of that house had
already been given. It was occupied by numerous tenants
and among them there may have been another Mrs. Wilson
whom Maunders knew and about whom he was ready to tes-
tify. He was, therefore, dismissed with the right to recall
him. It was easy for the prisoner's counsel to have proved
that no other Mrs. Wilson than the one who had testified re-
sided in the house described if that was the fact, or to have
required the prosecution to recall their witness so as to permit
of an identification. If without such identification Maun-
ders had been allowed to testify, his evidence would remain
open to a doubt whether he was speaking of the Mrs. Wilson
who testified, and it was to the interest of the prisoner to
remove that doubt and make that criticism impossible.

Abundant opportunity was afforded him to remove the
difficulty, and that his counsel failed to do so for some reason
of their own furnishes no sufficient ground of complaint.
The propriety of requiring an identification of the person
whose reputation was sought to be assailed became manifest
from the statement of Maunders that he did not know Mrs.
Wilson personally, but only that "such a party resided there."

One ground of the defense asserted was the insanity of the
prisoner. After it had been shown that he was subject to
fits of epilepsy, and to what were claimed to have been delu-
sions, that his mother died of paralysis and softening of the
brain, that he occasionally talked in a manner which the wit-
nesses deemed irrational, and that his mother had epileptic
fits during her lifetime, and her death was described in the
certificate of the health department as in consequence of the
disease of pachymeningitis, after this general proof Dr.

O'Brien was called by the defense as an expert. After several efforts to frame a suitable question, the doctor was permitted to answer that any man whose mother died of pachymeningitis would be predisposed to insanity. Such predisposition having been shown, the attention of the expert was drawn to the prisoner's actual mental condition, and a series of hypothetical questions were framed, to some of which objections by the prosecution were sustained. The ruling of the court in these instances was based upon the doctrine that the hypothesis submitted for an opinion must be based upon the proofs and must not go outside of the facts as to which some evidence had been given, and which, therefore, could be assumed as the possible truth. If the trial judge at one stage of the case expressed this doctrine somewhat more rigorously, he made no ruling which went beyond it. People *v.* McElvaine, 121 N. Y. 250; 30 N. Y. State Rep. 977. The first question assumed that the symptoms of the prisoner's fits indirectly proved that they were epileptic, and wholly omitted the other facts relied on. The court complained that the opinion of the expert was being asked "piece-meal," and the prisoner's counsel tried again. The second attempt included an injury to the skull, of which it was conceded that there had been no proof. The third attempt was not objected to, and the expert answered that the facts indicated epilepsy, and that "in epilepsy of course a person might at any moment become insane."

Very naturally, the prisoner's counsel was not satisfied with this answer, and for the fourth time framed a hypothetical question, but in doing so assumed as a fact proved, which had not been sworn to by any one, that the fits and fainting spells "indicated disease of the brain." The counsel renewed his effort, and after some discussion the fifth question was framed, and the court allowed it to be answered, but the expert replied: " I can't answer you with those facts · that you mention." Then followed a sixth effort to get an opinion. The question rested mainly upon the facts claimed to indi-

cate . the existence of delusions. The expert answered that the facts indicated delusion and a " symptom of a form of insanity." The prisoner's counsel, having obtained his answer, further inquired in several forms whether the prisoner " couldn't have committed the crime in one of these fits," and the questions were excluded. They were wholly immaterial. Nobody had denied that an insane person, whether made insane by epilepsy or any other cause, *could* commit a homicide. There was no such issue raised, and until some proof was given showing, or tending to show, insanity existing at the time of the homicide, what could or might have happened was of no consequence. What *did* happen was the issue on trial, and nobody claimed or pretended that an insane epileptic might not kill. Then, for the seventh time, the defense framed a hypothetical question. It covered quite fairly the general facts relied on, and the court permitted it to be answered. In all this we discover no ground of error. The trial judge was very patient and careful to protect the rights of the prisoner.

Explanation and discussion transformed improper questions into proper ones, which fairly presented the facts claimed to have been established by the defense, and those questions were permitted to be answered. We need not waste time over the unsuccessful efforts when the final result sought was fully accomplished in obtaining the opinion of the expert.

Along this line of inquiry a specific question was asked and excluded. It was this : " Suppose that a man commits a crime, and that when arrested for the crime, from his language, he had forgotten all about the crime, if he has committed it ? " The court asked for the evidence tending to support the hypothesis, and it turned out to be that when arrested he asked what he was arrested for. The inquiry did not indicate forgetfulness of what had occurred, and no rational argument to that purport could be founded upon it. The prisoner ran away after the shooting ; he did not know

whether his victim was alive or dead ; and so was ignorant of the crime with which he was charged. He might very naturally desire to know whether he was arrested for murder or assault with a deadly weapon, and so whether his wife was living or dead. How utterly without foundation in fact the inquiry was became manifest upon the prisoner's examination. He remembered every detail of the homicide, almost exactly as the witnesses had described it, and swore that he did not fire the shots, but that he heard another man's voice before the firing. Whatever else might be said, it is certain that he did not forget.

We have examined some other objections to evidence and to rulings, but are satisfied that no error was committed to the prejudice of the prisoner.

The judgment should be affirmed.

All concur.

*John R. Heinzelman,* for appellant.

*John W. Goff,* for respondent.