liable, and that in consideration of that liability, and upon the plaintiff's assuming the obligation to pay the notes, this transfer was made. From what the court said the jury could only infer that the court had intended to instruct them that this obligation to pay these notes when due, if Hughes did not pay them, was not of itself a sufficient consideration for the transfer. That, I think, was error.

We think, therefore, that the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

(33 App. Div. 193.)

### PRESTON v. OCEAN S. S. CO. OF SAVANNAH.

(Supreme Court, Appellate Division, First Department. August 10, 1898.)

1. LIABILITY OF MASTER—NEGLIGENCE OF SERVANT.
    An employé cannot hold the master liable in damages for personal injuries resulting from the plaintiff's unnecessary and careless use of proper materials furnished by the master.

2. OPINION EVIDENCE—HYPOTHETICAL QUESTION.
    A hypothetical question should not assume anything except what is based upon facts either admitted or established by evidence, or which, if controverted, the jury might legitimately find upon weighing the evidence.

Appeal from trial term, New York county.

Action by Patrick Preston against the Ocean Steamship Company of Savannah. From a judgment entered on the verdict of a jury, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Herbert R. Limburger, for appellant.
A. G. Vanderpoel, for respondent.

INGRAHAM, J. The plaintiff was injured from falling from a hatchway upon one of the steamships of the defendant, under the following circumstances: He was a longshoreman, engaged in loading a steamship, and after the loading was almost completed he was directed to close the hatchway over the hold, in which the loading had been completed. This hatchway was closed by 15 wooden hatches, which were placed by the men in position. The plaintiff, having so placed one of them, stepped upon it to place another in its position, when the one upon which he stood gave way, and he fell into the hold, a distance of 10 or 12 feet. These hatches were held in position by two pieces of timber called "strongbacks," on the border of which there was rabbeted a groove, making an edge of about one inch upon which the hatches rested on one end, the other end resting upon the coaming of the hatch, which was provided with a similar rabbet or groove. It does not appear who placed these strongbacks in position, but, the strongbacks being there, the plaintiff proceeded to put the hatches in place. He testified that he was ordered to put on the hatches. "We started at No. 5, at the port side of the ship, and put on No. 5; got No. 4, and put it on; and got No. 3, and, while in the

act of placing No. 3, No. 4 has gone out of its place, and went down into the hold, and carried me with it, and I be unconscious.     I know no further until I got to the hospital." Thus, the plaintiff had placed hatch No. 4 in its place.     He then began to place No. 3 where it belonged.     He walked upon No. 4, when it fell into the hold, carrying the plaintiff with it.     The accident was caused by the plaintiff's walking upon this hatchway which he had just put in position, and which, for some reason, did not catch upon the coaming it was intended to rest upon, but gave way under the plaintiff.     The placing of these hatchways upon these coamings was a very simple operation, requiring no skill or judgment.     The danger of the situation was as apparent to the plaintiff as to any one else.     It must have been apparent to him if, for any reason, this hatchway did not catch upon the coamings, or was too short, or had slipped to one side.     The hatchway was not placed in this position by the master, or any one acting under him or under his authority, but was the work that the plaintiff himself was employed to do; and any omission in placing properly these hatchways, either by the plaintiff or his fellow workmen, was not negligence for which the defendant was liable.     There was evidence offered on the part of the plaintiff tending to show that this hatchway No. 4 was a little short; that there had been a batten nailed on the end of the hatch, but that that batten had worked off.     The evidence is that this hatch had been used on this ship and in the same condition for years.     Upon it quantities of freight had been stored, and, if properly placed in position, it was secure.     It was the duty of the plaintiff, in placing this hatch cover in position, to see that it was properly secured before he walked upon it, and there is nothing to show that this falling of the hatch cover was due to anything else than that it was improperly placed in position, or improperly secured by the plaintiff and his fellow workmen.     The cause of the accident was, from all that appears, the act of the plaintiff and his fellow workmen in improperly securing this hatch cover and stepping upon it in that condition, not any fault of the defendant in providing either proper appliances for the plaintiff to work with, or a proper place for him to work.     This hatch cover was not furnished by the defendant for the plaintiff to stand upon, and there was no evidence that he was ever instructed to use it for that purpose.     If the hatch cover was insecure in the position in which the plaintiff had placed it, there is nothing to show that it was necessary for him to stand upon it in that condition in order to place the adjoining hatch cover in position.     The plaintiff could have stood upon the strongback, and placed the hatch in position, without walking upon the hatch cover, which was insecure, or he could have refused to take this position at all.     It was proved that the men, when they put this hatch cover No. 4 in position, were in the habit of putting pieces of wood upon both ends of the hatch to keep it from dropping into the hold, and it is quite evident that it was the neglect of the plaintiff to use this precaution before stepping upon the hatch that caused the injury.     There was also evidence tending to show that these strongbacks or hatch covers had to be somewhat loose when put in, to leave space for the swelling of the wood when wet; that the proper way to put on these hatches, and the way in which the men were instructed to

put them on, was by putting on all three of the first row—that is, the three No. 5 hatch covers—before No. 4 was put on at all. In that way the strongbacks were kept in position. But on this day this method was deviated from by the plaintiff and his fellow workmen. There was no evidence, however, that this rule had been communicated to the plaintiff or the man with whom he was working. Upon this testimony, we think there was no evidence which would justify a finding of negligence against the defendant. Assuming that one of these hatch covers—the one that fell—was somewhat too short, so that it was liable to fall unless all of the three hatch covers upon that row were down, and thus the strongback was securely held by the hatch cover on the other side, the method of placing these hatch covers, and thus covering the hatch, was left to the men who were engaged for that purpose. They were not required to stand upon one hatch cover until it. was securely fastened, and it was apparent to the man who put this hatch cover in place whether or not it was fastened securely and was safe to walk upon. The plaintiff voluntarily placed himself in this position of danger, not required by the orders of his employer,—not required by the necessity of the work which he was to do,—and the unsafe condition depended upon his omitting the ordinary precaution which it was shown the other men observed in putting down this hatchway, either as to the order in which the hatchways were put down, or blocking this particular one up with wedges of wood, to make a hatch cover safe before it was used to stand upon. Thus, going upon this hatch cover, which was in an insecure position, because of the neglect of the plaintiff to make it secure, was the cause of the injury, and this resulted from the plaintiff's own negligence, and not any negligence of the master. For this reason we think the complaint should have been dismissed.

There was also an objection to a hypothetical question asked by the plaintiff of a physician who was called as an expert, which question was answered under exception. We think this objection should have been sustained. The injury happened on January 31, 1894, and the plaintiff called a physician as expert, who first saw the plaintiff on the 13th day of July, 1897, over three years after the injury. He stated the condition of the plaintiff at the time he examined him and the method of his examination. Counsel for the plaintiff then asked the witness the hypothetical question, which was objected to by counsel for the defendant on the ground that the recital in the question was not in accordance with the evidence, and contained a large amount of matter which was immaterial to the question. Counsel for the defendant then specified the facts assumed by the question that he claimed were not proved, or upon which there was no evidence to justify the jury in finding that they were proved. This objection was overruled by the court, and the defendant excepted. I think the question was an improper one, as assuming facts which were not sustained by any evidence offered by the plaintiff, and the opinion of the witness, which was allowed to go to the jury, was not based upon facts proved or which the jury could find actually existed. One fact which the witness was required to assume by the question was that the plaintiff was a longshoreman, and worked on an average 10 hours per day. I

can find no evidence to show that the plaintiff ever worked on an average 10 hours per day, and the evidence referred to by counsel for the plaintiff does not tend to prove that fact. The plaintiff testified that he was a longshoreman, engaged in loading vessels; that he had assisted in discharging a vessel of bags of salt weighing 240 pounds and over; that he had worked at that 20 hours, day and night, with the exception of meal hours. A fellow workman was called as a witness, who said that he had worked with the plaintiff; that the average labor of a longshoreman was 5 or 6 hours per day at that season of the year, in some seasons some of them working probably 20 hours per day; that the witness had worked alongside of the plaintiff before he got hurt; that that was the only time that he knew him; that at the time of the injury the plaintiff and the witness were working 5 or 6 hours per day. This is all the evidence to which we are referred by counsel for the plaintiff as sustaining this fact, and it certainly does not tend to show that the plaintiff worked on an average 10 hours per day.

The question further assumed that the plaintiff fell on his back and head on the floor, and, becoming unconscious, remained so for about 30 minutes. There is not the slightest evidence to show that he remained unconscious for any particular time. One of the workmen on the ship at the time of the injury testified that, after the plaintiff fell to the lower deck, he was taken out by a sling, and sent upon the top deck. After that the witness did not see him until he went on the deck. The witness said that when he was on the deck he was unconscious. He does not say how long it took them to take the plaintiff out of the ship, or how long it was after the accident when he saw him on the deck. The plaintiff himself testified that the first remembrance of anything that he had after he fell was when he was out on the deck with a man holding him in his arms. Another witness testified that after the plaintiff fell he went down after him on a ladder, and helped to carry him over to the other side, in the wing, and laid him there, and that he seemed to be unconscious at that time; that the ship sailed about three-quarters of an hour afterwards, but the witness did not go ashore, but staid in the ship, and did not see the plaintiff again; that the witness remained upon the ship about one-half hour after the accident, but did not see the plaintiff on the deck. This is the only testimony to which we are referred by counsel for the plaintiff as proving the fact that he was unconscious for 30 minutes, and it certainly does not tend to prove that fact.

The question also required the witness to assume that the plaintiff could not walk fast, and not more than a mile or two, without feeling pain; that he could not stand erect or stoop without pain in the back and dizziness of the head, and was unable to do any work of a longshoreman. Neither of these facts was proved by the testimony. One of the facts most seriously litigated upon the trial was whether the condition in which this physician found the plaintiff at the time he examined him was the result of the accident, and this hypothetical question which was asked, and which the court allowed, was to establish the fact that the condition in which the physician found the plaintiff was the result of an injury as described in the

question. The testimony of this witness was the only medical testimony offered upon the trial, although the plaintiff had been treated in several hospitals immediately after the injury. None of the physicians who had there treated him were called by the plaintiff. Two of the physicians who had treated him in the hospital testified on the trial in behalf of the defendant, and their testimony materially contradicted the plaintiff's testimony. If this opinion of the plaintiff's physician was to be considered by the jury, it was most material that the facts upon which he based his opinion should be the facts which were fairly proved, or which, at least, were sustained by such evidence that the jury were justified in finding that they were true. We cannot tell what effect these facts which the witness was required to assume, and which were unproved, would have had upon the answer that he gave to the question. While counsel, in framing hypothetical questions of this kind, is entitled, not only to ask a witness to assume the facts which are proved without contradiction, he is also entitled to ask the witness to assume facts which he has given evidence to sustain, and which the jury might find from the evidence did actually exist. It is well settled that "hypothetical questions are allowed to be put to experts; but the hypotheses upon which they are examined must be based upon facts admitted or established by the evidence, or which, if controverted, the jury might legitimately find on weighing the evidence. Purely imaginary or abstract questions, assuming facts or theories for which there is no foundation in the evidence, are not admissible as matters of right." People v. Augsbury, 97 N. Y. 505. In the case of People v. Smiler, 125 N. Y. 717, 26 N. E. 312, it was decided, as stated in the headnote, that "hypothetical questions submitted for expert opinion must be based upon proof in the case, and must not go outside of the facts as to which some evidence has been given, and which could be assumed as the possible truth." When this question was objected to the court refused to pass upon the ground of the objection stated by counsel for the defendant, saying: "I am not going to frame a hypothetical question for either party, but am going to allow either party to take the risks of their statements." The attention of the plaintiff was called to the fact that, if his question assumed facts which were not proven, he would have to take the risk of the admission of such questions. The plaintiff still insisted upon his question, and, when the attention of the court was called to the specific facts assumed in the question, the court overruled the objection. The witness' answer to this question was most material. He said that the condition set forth in the hypothetical question as to the man's condition at the time of the fall would indicate that he had suffered from a concussion of the brain and spine; "and by a concussion we mean a sudden jar and shock, which shocks the brain substance so as to produce unconsciousness." The question itself was most unfair, stating facts and inferences which were not proved, and upon which a witness, the only expert called on behalf of the plaintiff, was asked to express an opinion; and we think, considering the size of the verdict and the state of the evidence as to the effect of this fall upon the plaintiff, that this error was highly prejudicial to the defendant.

It seems to us proper that attention should be called to the constant abuse in the preparation of these hypothetical questions. It is often most difficult for the court to determine, at the time such a question is asked, whether there is evidence to sustain a finding that all of the facts that the witness is asked to assume did exist; and counsel should always remember that, if a hypothetical question of this character is allowed, and if anything is assumed not based upon facts either admitted or established by evidence, or which, if controverted, the jury might legitimately find on weighing the evidence, an exception to the admission of such a question may be fatal to a verdict.

The judgment is therefore reversed, and a new trial ordered, costs to defendant to abide the event. All concur.